**CARIBE BMW, INC., Plaintiff,**

v.

**BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT and BMW of North America, Inc., Defendants.**

Civ. No. 91–1156 (RLA).

United States District Court, D. Puerto Rico.

May 13, 1993.

Enrique J. Mendoza–Mendez, Santurce, P.R., for plaintiff.

Adrian Mercado, Old San Juan, P.R., for intervenor El Fenix De Puerto Rico, Inc.

Manuel A. Guzman, McConnell Valdés, San Juan, P.R., for defendants.

## OPINION AND ORDER

ACOSTA, District Judge.

For a period of nine years, plaintiff, Caribe BMW, Inc. ("Caribe") was the sole importer-retailer in Puerto Rico of certain BMW auto-

mobiles and parts. Caribe worked under an "Importer Contract" it negotiated in Germany with codefendant Bayerische Motoren Werke Aktiengesellschaft ("BMW AG"), the German manufacturer of BMW cars and parts and Caribe's only supplier of BMW products. Caribe would buy BMW products directly from BMW AG in Germany, import them into Puerto Rico, and sell them to consumers in Puerto Rico. In December 1990, BMW AG terminated its contract with Caribe.

Thereafter, Caribe filed the present action against BMW AG for breach of contract, violation of the Puerto Rico Dealers' Contracts Act ("Act 75"), and violation of Federal and Puerto Rico antitrust laws. Under the same antitrust laws and allegations it raised against BMW AG, Caribe also sued BMW of North America ("BMW NA"), a wholly-owned subsidiary of BMW AG that imports BMW automobiles and parts into the continental United States where it sells them to various retailers. These retailers, in turn, sell the BMW products to consumers. There has never been a contractual relation between Caribe and BMW NA.

Plaintiff has amended its Complaint three times, twice in an attempt to cure various deficiencies raised by the defendants in a succession of dispositive motions. Before the Court are a combination of motions to dismiss the entire Second Amended Complaint (the "Complaint") and their respective oppositions. BMW NA and BMW AG have moved to dismiss the antitrust claims in Caribe's Complaint for failure to state a cause of action. BMW AG also avers that the court lacks *in personam* jurisdiction and that plaintiff's contract-based allegations should be dismissed because of a mandatory forum-selection clause in the Importer Contract making Germany the exclusive jurisdiction for all disputes.

## I. *BACKGROUND*

### A. THE COMPLAINT

There are four "counts" or causes of action alleged in Caribe's Complaint. Count one (Robinson–Patman Act and Puerto Rico's Antimonopolistic law) states that: (1) BMW AG charged Caribe higher prices than BMW NA contemporaneously charged retail outlets in the United States that were competing with Caribe in the resale of BMW automobiles of like grade and quality, in violation of Section 2(a) of the Robinson–Patman Act, 15 U.S.C. § 13(a), and the analogous Puerto Rico antitrust statute, P.R. Laws Ann. tit. 10 § 265; (2) BMW AG and BMW NA paid unidentified brokerage commissions or discounts in lieu thereof to its dealers, where no services were provided in return, in violation of Section 2(e) of the Robinson–Patman Act, 15 U.S.C. § 13(c); (3) BMW NA offered retail outlets in the continental United States competing with Caribe unspecified economic advantages unavailable to Caribe on proportionally equal terms, in violation of Sections 2(d) and 2(e) of the Robinson–Patman Act, 15 U.S.C. §§ 13(d) and (e), and P.R. Laws Ann. tit. 10 §§ 263(b) and (c); and (4) if BMW NA is deemed separate from BMW AG for Robinson–Patman Act purposes, then BMW NA knowingly induced and received a price discrimination in violation of Section 2(f) of the Robinson–Patman Act, 15 U.S.C. § 13(f), and P.R. Laws Ann. tit. 10, § 263(d).

Count two (Sherman Act and Puerto Rico law) states that: Caribe, under threat that it would be terminated as a BMW importer/retailer, agreed to a "secret condition" in the Importer's Contract prohibiting it from raising its retail prices above levels set by BMW AG and BMW NA, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the analogous Puerto Rico antitrust statute, P.R. Laws Ann. tit. 10 § 258.

Count three (Breach of Contract) alleges that BMW AG breached the Importer Contract by: (a) incorrectly representing that these contracts were "standard;" (b) charging Caribe prices that were not those that were "valid on the dates of the invoices;" (c) failing to sell Caribe the 318i model or its substantial equivalent; (d) failing to offer "factory support;" (e) directly or indirectly selling and delivering "cars destined to be sold in Puerto Rico;" and (f) unjustifiably terminating the contract.

Count four (Act 75) states that BMW AG violated the Puerto Rico Dealers' Contracts Act, P.R. Laws Ann. tit. 10, § 278, *et seq.*

(1964), by terminating the Importer Contract without just cause.

## B. PROCEDURAL BACKGROUND

Plaintiff's original complaint was filed on February 1, 1991 (Docket No. 1). It was quickly followed by a "First Amended Complaint" on March 18, 1991 (Docket No. 3).

On May 14, 1991, BMW NA filed a Motion to Dismiss and/or for Summary Judgment regarding the two antitrust claims in the First Amended Complaint, which were, and still are, the only claims asserted against BMW NA (Docket No. 9). Attached to BMW NA's motion was a three-paragraph affidavit by James Ryan, a BMW NA executive, as well as copies of blank "dealer agreements" BMW NA used in the mainland United States. BMW NA's motion also included a separate statement of material facts as to which BMW NA alleged there was no genuine issue to be tried. In essence, BMW NA argued that the amended complaint failed to state critical factual elements to properly assert antitrust claims.

During the early summer of 1991, plaintiff notified BMW NA with various wide-ranging discovery requests and deposition notices. BMW NA responded with an extensive "Motion for Protective Order," pursuant to Fed.R.Civ.P. 26(c) (Docket No. 13), enclosing copies of all the disputed discovery requests. In its Rule 26(c) motion, BMW NA argued that plaintiff's "broad-based merits discovery" should not be allowed or, in the alternative, that discovery should be limited to the antitrust issues raised in the pending motion to dismiss and/or for summary judgment, as allowed by Fed.R.Civ.P. 56(f).

On June 17, 1991, plaintiff responded by filing motions requesting discovery be com-

pelled, opposing defendants' motion to dismiss, and tendering an amended complaint.[1]

The sum effect of plaintiff's multiple filings was that it refused BMW NA's alternative suggestion that discovery be limited to the antitrust issues in BMW NA's motion to dismiss. Indeed, through its Rule 56(f) motion and its motion to compel, Caribe insisted on obtaining all the extensive discovery it originally sought. In addition, Caribe submitted a complete—despite its "preliminary" title—opposition to BMW NA's motion to dismiss and for summary judgment. And, finally, Caribe tendered a Second Amended Complaint expressly directed towards defeating BMW NA's motion to dismiss.

On July 10, 1991, the Court (Fusté, J.) granted BMW NA's motion for protective order, denied Caribe's Rule 56(f) motion and its motion to compel discovery, and stayed all discovery pending resolution of BMW NA's motion to dismiss the antitrust claims. The Court also allowed the Second Amended Complaint. (Docket No. 25) (the "Complaint").

Apparently unaware of the Second Amended Complaint, BMW AG's first pleading in the case, a motion to dismiss and/or for summary judgment, was directed towards the, by then moot, First Amended Complaint. (Docket No. 27, July 15, 1991). BMW AG's motion sought dismissal of the Complaint for lack of *in personam* jurisdiction and failure to state a cause of action as to the antitrust claims. Regarding the Act 75 and breach of contract claims (the "contract claims"), BMW AG requested summary judgment in its favor on the basis of a choice-of-forum clause in its contract with Caribe that designated Germany, and not Puerto Rico, as the only forum to

---

1. The motions were: (a) a "Cross Motion to Compel Answers to Caribe's Discovery Requests" and Opposition to BMW NA's Rule 26(c) motion (Docket No. 14); (b) a motion for leave to file a "Second Amended Complaint" (in direct response to BMW NA's Motion to Dismiss and/or for Summary Judgment) (Docket No. 15); (c) a tendered "Second Amended Complaint" (Docket No. 15); (d) a Fed.R.Civ.P. 56(f) motion to deny BMW NA's dispositive motion or to "continue a hearing on the motion until discovery has been conducted" (Docket No. 18) with an affidavit from William R. Pakalka, one of Caribe's attor-

neys; and (e) a motion obliquely entitled "Caribe BMW, Inc.'s Memorandum of Law in Preliminary opposition to Motion by Defendant BMW of North America, Inc. to Dismiss and for Summary Judgment" (Docket No. 17). Though the title of this last motion is confusing, the motion was clearly an opposition to BMW NA's motion for summary judgment since it included a separate "Statement of Material Facts as to Which There Exists a Genuine Issue to be Tried," as well as an affidavits from Juan Antonio Quintano Heilpern, President and principal stockholder of Caribe.

resolve their disputes. It supported its motion with a separate statement of uncontroverted material facts which was founded on two affidavits by BMW AG executives, to wit, Mr. Horst Dihlmann and Dr. Jost J. Schmitt.[2]

Meanwhile, BMW NA filed yet another motion to dismiss addressed to the antitrust claims in the Second Amended Complaint. (Docket No. 36). This time, however, BMW NA changed procedural tack: it withdrew its original request for summary judgment and framed its motion as strictly one to dismiss the Complaint. Arguing, correctly we believe,[3] that the Second Amended Complaint had wiped the procedural slate clean, BMW NA asked the court to ignore the Ryan affidavit and other exhibits it attached to its original motion, and to focus solely on the latest version of the Complaint. BMW NA argued that the Complaint by itself failed to state a cause of action. BMW NA also asserted that the requested dismissal should be with prejudice given that plaintiff has had no less than three opportunities to sufficiently plead its antitrust allegations, and had failed.

Plaintiff, for its part, filed a supplement to its opposition to BMW NA's Motion to Dismiss (Docket No. 39) (to which BMW NA responded, Docket No. 41). Then, on September 27, 1991, it simultaneously filed the following motions: (a) a renewal Fed. R.Civ.P. 56(f) motion, specifically requesting discovery only as to BMW NA and BMW AG's motions to dismiss the antitrust claims and as to BMW AG's Motion to Dismiss for lack of in personam jurisdiction (Docket No. 50);[4] (b) an opposition to BMW AG's Motion to Dismiss and Motion for Summary Judgment (Docket No. 51); and (c) an Opposition to BMW NA and BMW AG's Motion to Dismiss the antitrust claims (Docket No. 52).

BMW NA and BMW AG filed their respective replies and opposition to the Rule 56(f) request (Docket Nos. 56 and 57). We again find plaintiff's Rule 56(f) request unavailing as an unfocused and unsubstantiated "fishing expedition" and hereby DENY it.

On December 19, 1991, the case was reassigned to the undersigned judge (Docket No. 58).

The following motions are currently before the Court for resolution:

(a) BMW NA's motion to dismiss the Second Amended Complaint (Docket No. 36);

(b) BMW AG's Motion to Dismiss and/or for Summary Judgment (Docket No. 37);

(c) plaintiff's "Memorandum of Law in Preliminary Opposition to Motion by Defendant [BMW AG] to Dismiss and/or for Summary Judgment (Docket No. 51);

(d) Plaintiff's "Memorandum of Law in Preliminary Opposition to Defendants' BMW NA and BMW AG's Motion to Dismiss" (Docket No. 52); and

(e) BMW NA and BMW AG's "Reply" to plaintiff's three motions (Docket Nos. 56 and 57).

## II. ISSUES

The following issues raised by the outstanding motions will be addressed by the Court seriatim.

1. Should this Court exercise in personam jurisdiction over BMW AG?

2. Does the Complaint fail to state an antitrust cause of action against BMW NA and BMW AG?

3. Assuming the Court has personal jurisdiction over BMW AG, should it specifically enforce the forum-selection clause which des-

---

2. BMW AG's mistiming of its Motion for Summary Judgment, as opposed to its Motion to Dismiss included in the same document, has little practical effect regarding plaintiff's contract claims, since the only allegations that plaintiff had amended dealt exclusively with antitrust law. Regardless, BMW AG later slightly revised its original Motion to Dismiss and Motion for Summary Judgment and refiled it to correspond to the Second Amended Complaint (Docket No. 37, August 1, 1991).

3. Our impression is apparently shared by Caribe who in its most recent motion conceded that "BMW NA thus currently has pending before this Court only a motion to dismiss." Docket No. 50, at 2. We will proceed to consider only the allegations of the complaint for purposes of the requested dismissal of the antitrust claims.

4. Plaintiff's Rule 56(f) motion was completely silent as to BMW AG's motion to dismiss the contract claims.

ignates Germany as the exclusive jurisdiction for this dispute?

## III. *DISCUSSION*

■ Consistent with Fed.R.Civ.P. 12(b)(6),[5] we view the pleadings, affidavits and other competent submissions in a favorable light to plaintiff. *See Milton v. Van Dorn Co.*, 961 F.2d 965, 969 (1st Cir.1992). Our following summary of the facts reflects this favorable reading, but specifically omits "conclusory allegations, improbable inferences, and unsupported speculation." *Conley v. Gibson*, 355 U.S. 41, 45–48, 78 S.Ct. 99, 101–103, 2 L.Ed.2d 80 (1957); *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5 (1st Cir.1990); *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir.1989). Thus, we exempt "those 'facts' which have since been conclusively contradicted by plaintiffs' concessions or otherwise, and likewise eschew any reliance on bald assertions, unsupportable conclusions, and opprobrious epithets." *Chongris v. Board of Appeals*, 811 F.2d 36, 37 (1st Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987). *See also Gooley v. Mobile Oil Corp.*, 851 F.2d 513, 515 (1st Cir.1988) (to withstand a motion to dismiss, a complaint must contain specific factual allegations respecting all material elements necessary to sustain relief under an actionable theory).

BMW AG, a German corporation, manufactures automobiles and parts in Germany, which it sells throughout the world. BMW AG does not have offices, employees, manufacturing operations, real property or a license to do business in Puerto Rico.

Caribe is a Puerto Rico corporation. Caribe's major stockholders during 1981 through 1990 were Mr. Juan Quintano Heilpern and Mr. Pablo Benoit Hamel. Neither are American citizens nor residents of Puerto Rico: Mr. Quintano Heilpern is a citizen of Spain and Mr. Benoit Hamel is a citizen of either France, Spain or Chile.

BMW NA is a Delaware corporation with its principal place of business in New Jersey. BMW NA, not BMW AG, sells BMW automobiles and parts to retail outlets in the continental United States. Caribe competed with these retail outlets insofar as some consumers in Puerto Rico bought BMW automobiles and parts from continental retail outlets and shipped them privately into Puerto Rico.

In June 1981, BMW AG and Caribe negotiated a contract, titled the "Importer Contract," whereby Caribe agreed to purchase BMW cars and parts in Germany and import them into Puerto Rico for resale to the "motoring public." Title to the vehicles BMW AG sold to Caribe was transferred in Germany. The vehicles were paid for in German marks, and payment was made in Germany.

The negotiations that led to the Importer Contract in 1981 were conducted primarily in Munich, Germany between BMW AG and Mr. Quintano and/or Mr. Benoit, with some correspondence and telephone calls to and from Germany and Spain between these parties. These negotiations, and the transactions that sustained the contractual relationship between the parties over the years, were conducted by Messrs. Quintano or Benoit on behalf of Caribe and by various officers of BMW AG located in Germany. (No negotiations with Messrs. Quintano or Benoit took place in Puerto Rico.) The Importer Contract was renewed every year from 1982 until 1987.

---

5. Although, as stated above, the Court will limit its review of the defendants' motions to dismiss the *antitrust claims* strictly to the well-pleaded facts in the Complaint, no such limitation applies to our review of BMW AG's motion to dismiss the *contract claims*. Regarding these claims, we have reviewed the affidavits of Mr. Dilhmann and Dr. Schmitt, as well as a statement of uncontroverted facts submitted by BMW AG which, on the specific issue of the effect of the forum-selection clause, was *not* controverted by plaintiff. In fact, plaintiff focused its evidence and discovery requests on the antitrust and personal jurisdiction issues and never attempted to show that the clause was unreasonable or that Germany was a fundamentally unfair forum. Since plaintiff has the burden of proof on this issue, and given that BMW AG's motion was presented as one to dismiss the complaint and/or for summary judgment, then BMW AG's statement of facts and affidavits must be taken as true. *See Alvarado Morales v. Digital Equip. Corp.*, 843 F.2d 613, 615 (1st Cir.1988) and Local Rule 311.12, United States District Court for the District of Puerto Rico (failure to submit statement of *contested* facts in opposition to a motion for summary judgment results in movants' statement of uncontroverted facts being deemed admitted).

At some point in 1988, the parties conducted additional contractual negotiations in Munich, Germany. As a result, by letter dated July 8, 1988, BMW AG offered Caribe to enter into a three-year Importer Contract, effective until 1991. The offer was in German. Mr. Quintano accepted the offer on behalf of Caribe, although he objected to the automatic expiration clause. His objection was made in writing in German.

The following forum-selection clause appeared in the German language Importer Contract:

> Place of performance and fulfillment of this agreement, as well as the exclusive jurisdiction for disputes concerning the beginning and termination of this agreement, as well as all and any rights and duties arising out of this agreement, is Munich, Federal Republic of Germany.

This forum-selection clause was a part of all the renewals executed by the parties between 1981–1988. The Importer Contract also has a choice-of-law clause that states as follows:

> All disputes concerning the beginning and termination of this agreement, as well as all and any rights and duties arising out of this agreement, will be subject to the laws of the Federal Republic of Germany as applied between the German merchants.

BMW AG has similar Importer Contracts in approximately one hundred countries.

Sometime in 1987, BMW AG and BMW NA offered Caribe the opportunity to switch from being a direct purchaser of BMW AG to a direct purchaser of BMW NA. Caribe did not accept this offer. Thereafter, BMW AG extended Caribe's contract through June 1991, and Caribe continued to purchase from BMW AG.

During 1987, BMW NA gave its retail dealers in the continental United States payments of value and other considerations as compensation for services and facilities furnished by or through such retailers in connection with processing, handling, sale and offering for sale of BMW automobiles offered for sale by such retailers, none of which BMW AG made available on proportionally equal terms to Caribe. Also, Caribe's prices were higher than its competitors, i.e., BMW retail outlets in the continental United States. Caribe was not specifically told that the payments, rebates, allowances and other considerations that were extended by BMW NA to its retail dealers in the continental United States would be made available to Caribe on proportionally equal terms should it accept the offer to become a BMW NA retailer.

If Caribe had accepted the 1987 offer to buy directly from BMW NA, it would have been required to give up unspecified benefits resulting from its Importer Contract with BMW AG while remaining responsible for shipping BMW automobiles from the continental United States into Puerto Rico.

Caribe was unable to sell BMW vehicles at a price low enough to compete for consumer business with BMW dealers in the continental United States.

Consumers in Puerto Rico were charged higher prices by Caribe than they would have paid BMW retailers in the continental United States.

In 1990, BMW AG terminated its contract with Caribe.

## A. PERSONAL JURISDICTION

BMW AG asserts that it does not meet the minimum contacts test[6] to satisfy due process requirements because it does not own property, run business operations or conduct purposeful activities in Puerto Rico. Consequently, BMW AG argues that this Court cannot exercise jurisdiction over it and that the claims against it should be dismissed as a matter of law.

Plaintiff rejects BMW AG's contention and essentially argues that BMW AG's long term contractual relationship with Caribe and its predecessors—to sell cars in Puerto Rico and thus obtain benefits from Puerto Rico's economy and laws—sufficiently meets the minimum contacts test. Caribe also suggests that the Court cannot properly make this

---

**6.** *See generally International Shoe Co. v. State of Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and *Commonwealth of Puerto Rico v. S.S. Zoe Colocotroni,* 628 F.2d 652 (1st Cir.1980).

determination until it has allowed certain requested discovery on this issue. *See* Procedural Background *ante.*

Normally, contentions of this nature, given the circumstances alleged, would require greater scrutiny and the submission of additional evidence. However, we need not resolve this difficult jurisdictional issue, however, since we are dismissing the antitrust claims on the merits and the contract claims for improper venue.

■ This dismissal of the Complaint in favor of the party challenging our jurisdiction forecloses any need to consider the jurisdictional challenge since, for all practical purposes, it has become academic. *See Carnival Cruise Lines, Inc. v. Shute,* —— U.S. ——, ——, 111 S.Ct. 1522, 1528, 113 L.Ed.2d 622, 629 (1991) ("Because we find the forum-selection clause to be dispositive of [the question whether the District Court had personal jurisdiction over the defendant cruise line], we need not consider petitioner's constitutional argument as to personal jurisdiction"); *Norton v. Mathews,* 427 U.S. 524, 528–33, 96 S.Ct. 2771, 2733–76, 49 L.Ed.2d 672 (1976) (where merits can be easily resolved in favor of party challenging jurisdiction, resolution of complex jurisdictional inquiry may be avoided); *Secretary of the Navy v. Avrech,* 418 U.S. 676, 677–78, 94 S.Ct. 3039, 3039–40, 41 L.Ed.2d 1033 (1974) (no need to argue the jurisdictional issue where the decision on the merits is foreordained); *Lambert v. Kysar,* 983 F.2d 1110, 1118, n. 11 (1st Cir.1993) ("we have repeatedly held that complex jurisdictional issues may be bypassed in circumstances when it is clear that the party challenging jurisdiction will prevail on substantive grounds in any event ... [also] the rule that determination of jurisdictional issues should 'usually precede' determination of

substantive law apply only weakly, if at all, in forum-selection cases...."); *Feinstein v. Resolution Trust Corp.,* 942 F.2d 34, 40 (1st Cir.1991) (same); *Kaiser v. Armstrong World Industries, Inc.,* 872 F.2d 512 (1st Cir.1989) (same).

Accordingly, we will assume, for purposes of argument, but without deciding, that we have personal jurisdiction over BMW AG and subject matter jurisdiction as well. *Norton,* 427 U.S. at 530–32, 96 S.Ct. at 2774–76.

### B. ANTITRUST CLAIMS

#### 1. *Robinson–Patman Act*

#### (a) "Single Seller" Requirement

[3; 4] To assert a *prima facie* claim under any of the provisions of the Robinson–Patman Act, a plaintiff must allege that the asserted discriminations involved a *single* seller. *See, e.g., Walpa Constr. Corp. v. Mobile Paint Mfg. Co.,* 701 F.Supp. 23, 27 (D.P.R.1988).[7] In its Complaint, Caribe in the first instance bases its Robinson–Patman claims on sales by BMW AG to Caribe *and* sales by BMW AG's wholly-owned subsidiary BMW NA to BMW retail dealers in the continental United States. Caribe recognizes that the two defendants are located in two different countries and that they are separately incorporated. Nevertheless, plaintiff attempts to satisfy the "single seller" requirement of the Robinson–Patman Act by lumping BMW AG and BMW NA together as "collectively BMW." [8] This is clearly insufficient.

■ Although sales by two affiliated companies can, under certain circumstances, be treated as having been made by a single seller for Robinson–Patman Act purposes, such linkage cannot be presumed even if one

---

7. *See also Pierce v. Commercial Warehouse,* 876 F.2d 86, 87 (11th Cir.1989), *cert. denied,* 493 U.S. 1045, 110 S.Ct. 841, 107 L.Ed.2d 836 (1990); *Barnosky Oils, Inc. v. Union Oil Co.,* 665 F.2d 74, 83 (6th Cir.1981); *FLM Collision Parts, Inc. v. Ford Motor Co.,* 543 F.2d 1019, 1024 (2d Cir. 1976); *Hiram Walker, Inc. v. A & S Tropical, Inc.,* 407 F.2d 4, 7 (5th Cir.1969); *Metro Video Dist., Inc. v. Vestron Video, Inc.,* 1990–1 Trade Cas. ¶ 68, 986 at 63, 348, 1990 WL 58463 (D.P.R. 1990); *Carlock v. Pillsbury Co.,* 719 F.Supp. 791, 845 (D.Minn.1989).

8. This lumping together of the defendants is so indiscriminate and confusing as to constitute an attempt to make BMW AG and BMW NA look like a single entity by the simple fiat of referring to them collectively or separately to suit plaintiff's purposes. For example, in paragraph 11 of the Complaint, plaintiff refers to "BMW" as the manufacturer of BMW products, where clearly BMW NA, as opposed to BMW AG, is not a manufacturer of anything.

seller is wholly owned by the other. *Acme Refrigeration of Baton Rouge, Inc. v. Whirlpool Corp.*, 785 F.2d 1240, 1243 (5th Cir.) ("the same seller doctrine, however, is not to be invoked merely upon a showing that one seller is wholly owned by another"), *cert. denied*, 479 U.S. 848, 107 S.Ct. 171, 93 L.Ed.2d 108 (1986). Rather, a Robinson–Patman Act plaintiff must make an "affirmative showing" that the parent actually controls the subsidiary's selling activities. *Id.* (citing III E. Kintner & J. Bauer, *Federal Antitrust Law* § 21.16 at 212 (1983); 4 J. Von Kalinowski, Antitrust Laws and Trade Regulation § 24.04[2][a] (1985)). Specifically, a parent will not be considered to be the same seller as its wholly-owned subsidiary for purposes of the Robinson–Patman Act unless the plaintiff *affirmatively pleads* and shows that the parent actively controls the subsidiary by dictating the customers to whom it sells merchandise, as well as the prices, terms, and conditions of the sales made by the subsidiary. *See, e.g., Acme Refrigeration of Baton Rouge, Inc. v. Whirlpool Corp.*, 785 F.2d 1240, 1243 (5th Cir.), *cert. denied*, 479 U.S. 848, 107 S.Ct. 171, 93 L.Ed.2d 108 (1986), *Island Tobacco Co. v. R.J. Reynolds Indus.*, 513 F.Supp. 726, 734 (D. Hawaii 1981); *Baim & Blank, Inc. v. Philco Corp.*, 148 F.Supp. 541, 544 (E.D.N.Y. 1957). *See also Security Tire & Rubber Co. v. Gates Rubber Co.*, 598 F.2d 962, 966 (5th Cir.1979), *cert. denied*, 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309 (1980).

Under this clear precedent, Caribe's unsupported conclusion that BMW AG and BMW NA are a single entity, and thus a single seller for Robinson–Patman purposes, cannot survive the defendants' well-founded challenge, particularly considering that plaintiff has had ample warning and opportunities to meet its burden. In short, Caribe has not alleged the essential facts necessary to support an assertion that BMW AG and BMW NA are a single seller for purposes of the statute.

Because Caribe has failed to allege sufficiently that the alleged discriminatory sales were made by the same seller, a crucial jurisdictional element of its Robinson–Pat-

man claims has not been satisfied, thus requiring dismissal of each such claim.

■ Plaintiff's counsel has argued that BMW AG impermissibly discriminated against Caribe by selling on more favorable terms to Caribe's alleged "competitor" BMW NA. However, there is no such claim in Caribe's pleadings. Its Second Amended Complaint, as did its prior complaints, alleges only that Caribe is an "importer-retailer purchasing directly from the factory" and that Caribe resells those automobiles solely "to the motoring public." (Complaint, ¶¶ 15 and 14). Also, Caribe has contended throughout that it competes with the BMW *retailers* that buy from BMW NA, not with BMW NA itself. Nowhere is it alleged that Caribe is an "importer-distributor" competing with BMW NA for sales of BMW automobiles to retail dealers. Caribe's counsel cannot substitute with argument what is Caribe's affirmative duty to plead with specificity. *See Daury v. Smith*, 842 F.2d 9, 15 (1st Cir.1988) ("we do not think our duty to liberally construe the pleadings gives a plaintiff the license to amend the complaint by memorandum . . . ."); *Glaros v. Perse*, 628 F.2d 679, 681 (1st Cir.1980) (same). The cases cited by Caribe apply only to the situation in which the same supplier sells goods to its subsidiary at more favorable prices than it sells to a purchaser competing with the subsidiary in the resale of the goods. Because Caribe does not contend in the Complaint that it resells to dealers in competition with BMW NA or has ever sought to compete with BMW NA, Caribe's argument is misplaced. *Acme Refrigeration*, 785 F.2d at 1242–1244.

In sum, Caribe's repeated failure to allege in any of its complaints that it competes with BMW NA in sales to retail dealers in the mainland United States, or that it has sought to do so, compels dismissal of the Robinson–Patman claims.

### (b) Availability

■ Plaintiff's Robinson–Patman claims are subject to dismissal for yet another reason. Caribe's basic Robinson–Patman claims rest upon the conclusory allegation that prices, allowances and services given by BMW NA to the retail dealers in the conti-

nental United States which competed with Caribe allegedly were more favorable than the prices, allowances, and services provided by BMW AG to Caribe. Caribe also asserts, however, that it was offered the opportunity to become a BMW NA retailer—an offer it rejected. However, Caribe argues that it was not told at that time about these favorable terms. But, importantly, Caribe fails to claim that if it had known, it would have switched suppliers from BMW AG to BMW NA. Instead, Caribe alleges that it had no duty to make such a switch and did not want to lose unspecified benefits as BMW AG's importer-retailer. Thus, regardless of how the opportunity to become a BMW NA retailer were presented to Caribe, it would have rejected it.

■ A Robinson–Patman Act claim will not lie if the buyer fails to take advantage of favorable prices or arrangements that were in fact made available to it. *See, e.g., Bouldis v. U.S. Suzuki Motor Corp.,* 711 F.2d 1319, 1326 (6th Cir.1983); *Shreve Equip., Inc. v. Clay Equip. Corp.,* 650 F.2d 101, 105 (6th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981); *Rod Baxter Imports, Inc. v. Saab–Scania of America, Inc.,* 489 F.Supp. 245, 249 (D.Minn.1980). Thus, Caribe's factual averments indicate that its alleged injury was self-inflicted and beyond Robinson–Patman protection.

Caribe attempts to salvage its Robinson–Patman Act claims by asserting that the favorable prices and concessions it sought were not made "practically available" to it because to have taken advantage of the offers would have required Caribe to alter its purchasing status. This argument cannot withstand close scrutiny.

■ All that Caribe had to do to obtain the prices and concessions allegedly offered to BMW NA's retail dealers was to become one—and purchase BMW automobiles from BMW NA rather than from BMW AG. We find no judicial authority for the point of view that a favorable treatment is 'practically' unavailable to a buyer if the buyer has to change suppliers to obtain such treatment. In fact, the case law is to the contrary. *See, e.g., Hanson v. Pittsburgh Plate Glass Indus., Inc.,* 482 F.2d 220, 227 (5th Cir.1973),

*cert. denied,* 414 U.S. 1136, 94 S.Ct. 880, 38 L.Ed.2d 761 (1974); *Tri–Valley Packing Ass'n v. F.T.C.,* 329 F.2d 694, 703–04 (9th Cir.1964).

Caribe also states in the Complaint that it was never told it would not be discriminated against if it had agreed to become a BMW NA dealer. Caribe seems to be saying that when the defendants offered it the opportunity to purchase from BMW NA, they had a legal duty to inform Caribe that it would not be discriminated against.

■ However, absent factual allegations to the contrary—allegations that Caribe has not made—the law presumes that BMW NA would have behaved properly, not unlawfully. *See* P.R.R. Evidence, T. 32 Ap. IV R. 16, presumption 32; 29 Am.Jur.2d *Evidence* §§ 168–169 at 209–10 (1967) (1993 Supplement). As our Court of Appeals has cautioned, the liberal pleading rules do not "entitle a plaintiff to rest on 'subjective characterizations' or conclusory descriptions of a general scenario which could be dominated by unpleaded facts." *Correa–Martínez v. Arrillaga–Beléndez,* 903 F.2d 49, 52–53 (1st Cir. 1990) (citing *Dewey v. Univ. of New Hampshire,* 694 F.2d 1, 3 (1st Cir.1982)), *cert. denied,* 461 U.S. 944, 103 S.Ct. 2121, 77 L.Ed.2d 1301 (1983). Rather, "[i]t is only when such conclusions are logically compelled, or at least supported, by the *stated* facts, that is, when the suggested inference rises to what experience indicates is an acceptable level of probability, that 'conclusions' become 'facts' for pleading purposes." *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir.1989) (emphasis added).

### (c) Sections 2(c), 2(d) and (e)

■ Caribe also alleges claims under sections 2(c), 2(d) and 2(e) of the Robinson-Patman Act. In doing so, Caribe simply quotes or paraphrases statutory language without providing any factual support.

■ The mere incantation of antitrust "buzzwords" cannot substitute for necessary factual allegations establishing a valid claim for recovery. Since plaintiff's bald state-

ments that these antitrust violations occurred are not supported by facts, it has failed to state a claim for which relief may be granted. *See, e.g., Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1110 (7th Cir.1984) ("[I]nvocation of antitrust terms of art does not confer immunity from a motion to dismiss...."), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985); *Kaiser Aluminum v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *Klebanow v. New York Produce Exchange,* 344 F.2d 294, 299 (2d Cir.1965).

### (d) Section 2(f)

■ Caribe also charges BMW NA with knowingly receiving a forbidden price discrimination in violation of section 2(f) of the Robinson–Patman Act. This claim must be dismissed as well.

■ A customer cannot claim injury under the Robinson–Patman Act for preferences allegedly given to another customer with whom it does not compete. *See, e.g., White Indus., Inc. v. Cessna Aircraft Co.,* 845 F.2d 1497, 1498–1500 (8th Cir.), *cert. denied,* 488 U.S. 856, 109 S.Ct. 146, 102 L.Ed.2d 118 (1988); *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.,* 842 F.2d 578 (2d Cir.1987); *National Distillers & Cham. Corp. v. Brad's Machine Prods., Inc.,* 666 F.2d 492 (11th Cir.1982).

As already explained, Caribe's Complaint alleges solely that Caribe is an "importer-retailer" selling to the "motoring public" in competition with dealers purchasing from BMW NA. Nowhere is it alleged that Caribe is in competition with BMW NA for sales to dealers, as it must be alleged for Caribe's claim under section 2(f) to withstand dismissal.

### 2. *Sherman Act Claims*

■ Caribe alleges that it was forced—on threat of termination of its contract with BMW AG—to agree not to *raise* its retail prices above levels set by BMW AG, in violation of section 1 of the Sherman Act. Caribe claims that it lost profits as a result of this alleged maximum resale price maintenance agreement.

However, plaintiff lacks standing to pursue such relief. Section 4 of the Clayton Act limits standing to bring an action for treble damages under the Sherman Act only to "person[s] who shall be injured in [their] business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. Thus, to have standing under section 4, a plaintiff must have suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). *See also Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 335–39, 110 S.Ct. 1884, 1889–90, 109 L.Ed.2d 333 (1990).

■ In *USA Petroleum,* the Supreme Court limited dealer standing for maximum resale price maintenance claims to three kinds of injury: (i) injury caused when prices are fixed too low for the dealer to furnish services essential to the value which goods have for the consumer, or to furnish services and conveniences which consumers desire; (ii) injury caused to smaller dealers when the fixed prices channel distribution through a few large or specifically advantaged dealers; and (iii) injury that results when the maximum price approaches the actual cost to the dealer and acquires the attributes of an arrangement fixing minimum prices. Because it is not included in any of these categories, recovery of profits alleged to have been lost as a result of a maximum resale price maintenance scheme—the only injury claimed by Caribe—is barred by *USA Petroleum.*[9]

---

9. The Supreme Court has consistently recognized that lost profits, without more, is *not* antitrust injury. *USA Petroleum,* 495 U.S. at 337–41, 110 S.Ct. at 1890–91; *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 109–10, 116, 107 S.Ct. 484, 488–89, 492, 93 L.Ed.2d 427 (1986); *Brunswick Corp.,* 429 U.S. at 488, 97 S.Ct. at 697. In any event, the assertions underpinning Caribe's maximum resale price maintenance claim are inconsistent with the facts allegedly at the heart of this dispute. Caribe's basic claim is that it could not compete with dealers located in the continental United States because those dealers' prices for BMW automobiles were allegedly too low to permit Caribe to compete. Yet, in its Sherman Act claim, Caribe contends that it has

### 3. Puerto Rico Antitrust Laws

Caribe also seeks relief under the antitrust laws of Puerto Rico, P.R. Laws Ann. tit. 10, §§ 258, 264. We look, as we must, to the jurisprudence interpreting the federal antitrust laws as a guide in applying the statute. *See Diario de Sesiones,* 1964, Vol. 18, Part 4, pp. 1425–26, 1509, 1512, 1707–1709; *see also Whirlpool Corp. v. U.M.C.O. Int'l Corp.,* 748 F.Supp. 1557, 1565 n. 4 (S.D.Fla.1990) (Puerto Rico antitrust law claims).

Accordingly, Caribe's claims under the antitrust statute of Puerto Rico are dismissed for the same reasons that dismissal of Caribe's federal antitrust claims is required.

### 4. Conclusion

■ It is by now clear to us that plaintiff's repeated failure to cure the defects in its Complaint are not problems with drafting, but of substance. After three failures to meet its burden of properly pleading antitrust claims, the issue should be foreclosed permanently. *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 515 n. 2 (1st Cir.1988) ("To borrow a baseball aphorism, three strikes and out seems to us not unfair ... where—as here— plaintiff has had (and used) several prior opportunities to amend his complaint"); *see also Abrecht v. Lund,* 845 F.2d 193 (9th Cir.1988) ("Plaintiff was given every opportunity to cure a formal defect in his pleadings, it now appears to a certainty that plaintiff cannot state a claim.").

Therefore, plaintiff's antitrust claims are hereby DISMISSED with prejudice.

### C. FORUM–SELECTION CLAUSE

Plaintiffs' breach of contract and violation of Act 75 claims (collectively the "contract claims") are predicated, *inter alia,* on allegations that BMW AG breached various provisions or representations in the Importer Contract and terminated the same "unjustifiably" or "without just cause." Although there is a dearth of facts in the record to support these two causes of action, we must first determine the effect to be accorded the forum-selection clause negotiated by the parties.

BMW AG moves the Court to dismiss the contract claims and requests that the Court enforce the forum-selection clause in the Importer Contract calling for Germany as the exclusive jurisdiction. BMW AG also argues that Germany would be the more convenient forum for this dispute.

In opposition, Caribe argues [10] that the forum-selection clause cannot "oust this court of jurisdiction;" that the clause does not cover Caribe's claims; that Caribe could not have "foreseen litigating in Germany" and that the clause "offends" Puerto Rico public policy.

In sum, Caribe does not challenge the validity of the forum-selection clause, but questions its scope and enforceability. Caribe, however, has *not* even attempted to controvert any of BMW AG's statements of uncontroverted facts or affidavits that support its motion to dismiss for improper venue. Nor has Caribe specifically requested that it be allowed to conduct discovery on *this particular issue,* thus conceding the matter is ready for summary disposition.

#### 1. Applicable Law

##### (a) The Erie Issue

Forum-selection clauses, particularly regarding international commercial agreements, have long been enforced by the federal courts as a matter of federal common law. *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 1913, 32 L.Ed.2d 513 (1972); *Lambert v. Kysar,* 983 F.2d 1110 (1st Cir.1993). Historically, however, such clauses were discouraged by federal and state courts as an unnecessary restraint on access to the courts. *See, e.g., Home Ins. Co. v. Morse,* 87 U.S. (20 Wall) 445, 451, 22 L.Ed. 365 (1874). The *Morse* view, though now widely considered outmoded, apparently still

been damaged, through the loss of profits, by its alleged inability to *raise* its prices above a level purportedly set by its supplier. Surely, Caribe cannot have it both ways.

10. Among its arguments, Caribe places great emphasis on the public policy behind keeping antitrust suits in the United States, and avoiding two separate actions involving BMW AG and BMW NA. We need not consider these arguments given our dismissal of the claims against BMW NA.

has not been completely discarded by some state courts. *See, e.g., Lambert, supra* (discussing Massachusetts law).

In the context of a diversity case such as the present one, there is some confusion as to whether forum-selection clauses are to be treated as substantive or procedural under the *Erie* doctrine. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The Supreme Court has not squarely resolved the issue [11] and the circuits are split. *See Lambert v. Kysar,* 983 F.2d at 1116, n. 10 (for a discussion of the cases). The issue seems important at first blush because were we to consider the matter procedural, federal law governs. If, however, we conclude it is a substantive issue, then we must apply Puerto Rico law. The choice could be significant if Puerto Rico, like other state fora, has not closely followed the more enlightened perspective first articulated by *The Bremen* Court two decades ago.

The First Circuit Court of Appeals has determined, in a case very similar to this one, that questions of venue are procedural in nature and, therefore, federal common law, and not Puerto Rico law, controls. *Royal Bed & Spring Co. v. Famossul Industries e Comercio de Moveis Ltda.,* 906 F.2d 45, 49 (1st Cir.1990) (Act 75 claims; diversity jurisdiction; Brazilian venue chosen under the *forum non conveniens* doctrine). In *Royal Bed,* the court considered significant a forum-selection clause that provided "that ... Brazil is the proper forum to settle any disputes...." and held that Act 75 was not a bar to dismissal for improper venue when there existed no fundamental unfairness in sending the case to the foreign tribunal.

*Royal Bed,* therefore, did not specifically resolve the present issue: whether or not in diversity cases the enforcement of a forum-selection clause by itself is ruled by federal or state law.

Recently, however, the First Circuit discussed this problem in the context of a Massachusetts contract dispute that included a Washington choice-of-forum clause. In es-sence, the court found that the applicable state law (Washington) *did not conflict* with federal law. Therefore, the court declined to reach the *Erie* issue and held that the forum-selection clause was enforceable. *Lambert, supra.*

Thus, though we have the *Royal Bed* decision as an important beacon, the *Lambert* decision leaves us in the same twilight zone of uncertainty faced by many others over whether forum-selection clauses are procedural or substantive for purposes of *Erie.* Nonetheless, following the analysis in *Lambert,* we have carefully studied Puerto Rico law and conclude that it too is in accord with federal common law; thus, we need not try to resolve the vexing problem created by the *Erie* doctrine.

### (b) Puerto Rico Law

■ The most recent pronouncement by the Supreme Court of Puerto Rico on forum-selection clauses is *Unisys P.R. Inc. v. Ramallo Brothers Printing Inc.,* 91 J.T.S. 69 (1991). In *Unisys,* the Court discussed the validity and enforceability of a clause requiring a Michigan venue in a contract between the defendant and the third party defendant. The plaintiff was not a party to that contract. The Court found that forum-selection clauses should be generally enforced, but that under the circumstances of the case, it would be patently unfair to enforce the clause because plaintiff was an indispensable party who would not be available in the Michigan forum.

The Court determined that since there was no Puerto Rico jurisprudence on forum-selection clauses, it would resort to the extensive federal common law on the issue. *Id.* at 8855.

The lucid opinion adopts step-by-step the basic tenets of federal common law on forum-selection clauses. To wit, the Puerto Rico Supreme Court held that:

(i) forum-selection clauses are *prima facie* valid if reasonable, absent any fraud or over-reaching, *id.* (citing *Midwest Mech. Contr. v.*

---

11. *Cf.* Julia L. Erickson, *Forum Selection Clauses in Light of the Erie Doctrine and Federal Common Law: Stewart Organization v. Ricoh Corporation,* 72 Minn.L.Rev. 1090 (1988) (for the proposition that after the Supreme Court's *Stewart* opinion, 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988), only federal common law applies to forum-selection clauses).

*Tampa Constructors, Inc.*, 659 F.Supp. 526, 530 (W.D.Mo.1987));

(ii) forum-selection clauses are "intimately related to the public policy of not imposing obstacles on interstate and international commerce." *Id.* (citing and quoting *The Bremen*, 407 U.S. at 16, 92 S.Ct. at 1916) (translation ours);

(iii) there is a "strong presumption" in favor of the validity of such clauses, and their application extends to all types of cases; *Id.* (citing and quoting *Houston Intern. Televideo v. Technicolor Inc.*, 647 F.Supp. 554, 555 (S.D.Tex.1986)) (translation ours); (iv) "enforcing a forum-selection clause protects the legitimate interests of the parties, their expectations, and above all, fosters vital interests of the system of justice," *Id.* (citing *Stewart Organization v. Ricoh Corp.*, 487 U.S. 22, 33–34, 108 S.Ct. 2239, 2245–2246, 101 L.Ed.2d 22, 33–34 (1988) (Concurrence; Kennedy, J.)) (translation ours); and

(v) the party resisting enforcement of the clause bears a heavy burden of proof to show unreasonableness (citing *Kline v. Kawai America Corp.*, 498 F.Supp. 868, 871 (1980)).

The Court thus held that forum-selection clauses are presumptively valid and necessary for the freedom of international commerce and to promote "vital interests of the system of justice." Consequently, a party trying to avoid its part of a valid bargain bears a very heavy burden to prove that the clause is unreasonable.

In sum, the Puerto Rico Supreme Court has fully adopted the federal jurisprudence on forum-selection clauses and established a doctrinal approach that is in complete accord with federal law, thus obviating any *Erie*-type problems at bar.

### (c) Federal Common Law

[19] The seminal case in the area of forum-selection clauses is *The Bremen*. In that case, an American and a German corporation entered into an international towage contract that required that all disputes be heard in England. The tug and tow were forced by a severe Gulf storm to safe harbor in Tampa, where the American corporation, in violation of its agreement, sued for damages caused to its property. The lower courts, reflecting the historical disdain for forum-selection clauses, denied the German corporation's motion to enforce the forum-selection clause. The Supreme Court reversed, holding that the enforcement of such clauses "accords with ancient concepts of freedom of contract and reflects an appreciation of the expanding horizons of American contractors who seek business in all parts of the world." *The Bremen*, 407 U.S. at 11, 92 S.Ct. at 1914.

The Supreme Court found that forum-selection clauses are "*prima facie* valid and should be enforced" unless the resisting party meets its "heavy burden" and proves that enforcement would be unreasonable under the circumstances. *Id.* at 10, 92 S.Ct. at 1913. A clause is unreasonable only if it is invalid, or fundamental fairness compels that it not be enforced. The clause is invalid, said the Court, only if it is shown to have been the product of "fraud, undue influence, or overweening bargaining power." *Id.* at 12, 92 S.Ct. at 1914. It should be held unenforceable, added the Court, "if the chosen forum is *seriously* inconvenient for the trial of the action." *Id.* at 16, 92 S.Ct. at 1916 (emphasis in original), or enforcement would be manifestly unjust.

The Court made clear, however, that the issue was not one of convenience of the forum, as with the doctrine of *forum non conveniens*,[12] but of holding the parties to their

---

12. The lower courts in *The Bremen* approached the motion to dismiss as one under *forum non conveniens*, that is, whether the movant could prove that the London forum was more convenient than the Tampa forum. The Supreme Court said that this was the wrong approach since the contract "expressly resolved that issue [of convenience of forum]. The correct approach would have been to enforce the forum clause specifically unless [non-movant] could clearly show that enforcement would be unrea-

sonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Id.* at 15, 92 S.Ct. at 1916. Various federal courts have applied this approach, that is, specifically enforcing the forum-selection clause rather than analyzing the *forum non conveniens* doctrine. *See, e.g., Crown Beverage Co. v. Cervecería Moctezuma*, 663 F.2d 886 (9th Cir.1981) (antitrust and distributorship contract between American and foreign companies providing for Mexican forum); *Coastal Steel Corporation v. Tilghman Wheelabra-*

"freely negotiated private international commercial agreement" absent a clear showing that the chosen forum "will be so manifestly and gravely inconvenient to [the resisting party] that it will be effectively deprived of a meaningful day in court. . . ." *Id.* at 16 and 19–20, 92 S.Ct. at 1916 and 1918. Indeed, the Court emphasized that: "where it can be said with reasonable assurance that at the time they entered the contract, the parties to a freely negotiated private international commercial agreement contemplated the claimed inconvenience, *it is difficult to see why any such claim of inconvenience should be heard to render the forum clause unenforceable.*" *Id.* at 16, 92 S.Ct. at 1916 (emphasis added).

Finally, *The Bremen* Court rejected the lower court's outdated jurisdictional conceptions by articulating the forum-selection clause credo:

> The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on the parochial concept that all disputes must be resolved under our laws and in our courts. . . . We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws and resolved in our courts.

*Id.* at 9, 92 S.Ct. at 1912.

"While *Bremen* involved a suit in admiralty, its wisdom has been unhesitatingly applied in land-based diversity actions." *D'Antuono v. CCH Computer Systems, Inc.*, 570 F.Supp. 708, 711 (D.R.I.1983) (Selya, J.) (case citations omitted).

On the strength of *The Bremen*, the First Circuit has held that: "To establish that a particular choice of forum clause is unreasonable, a resisting party must present evidence of fraud, undue influence, overweening bargaining power or . . . serious inconvenience in litigating." *Fireman's Fund American*

*Insurance Companies v. Puerto Rican Forwarding Co., Inc.*, 492 F.2d 1294, 1297 (1st Cir.1974). *See also GKG Caribe, Inc. v. Nokia–Mobira, Inc.*, 725 F.Supp. 109, 112 (D.P.R.1989) (Gierbolini, J.) (Act 75 claims) ("no basis for assuming forum inadequate or selection unfair absent a showing [of *The Bremen* factors]"); and *McCain Foods Ltd. v. Puerto Rico Supplies, Inc.*, 766 F.Supp. 58, 60 (D.P.R.1991) (Cerezo, J.) (Act 75 claim, Canada arbitration) ("the forum-selection clause must be strictly enforced").

As will be discussed in more detail, in the present case Caribe has failed to meet its burden of showing that, pursuant to *The Bremen* and its progeny, the forum-selection clause is invalid or should not be enforced. Thus, like *The Bremen* Court, we hold that "in light of present day commercial realities and expanding international trade, we conclude that the forum clause should control. . . ." *The Bremen*, 407 U.S. at 15, 92 S.Ct. at 1916.

### 2. *Scope and Validity of Forum–Selection Clause*

■ Caribe's argument regarding the scope of the forum-selection clause as it pertains to the contract claims seems to be that the clause is not as "narrowly drafted" as certain others that it cites, thus it cannot cover Caribe's contractual claims. This argument is misconceived. First, the clauses Caribe compares contain distinctions without any difference. This is particularly true regarding its reliance on *Bense v. Interstate Battery System of America, Inc.*, 683 F.2d 718, 720 (2d Cir.1982).[13]

Second, we fail to see how the clear and mandatory import of the clause at issue here can be avoided. It reads: "*. . . the exclusive jurisdiction for disputes* concerning the . . . termination of this agreement as well as any rights and duties arising out of this agreement *is . . . Germany.* "

tor Ltd., 709 F.2d 190 (3d Cir.1983) (England); *Warner & Swasey Co. v. Salvagnini Transferica*, 633 F.Supp. 1209 (W.D.N.Y.), *aff'd* on basis of opinion below, 806 F.2d 1045 (Fed.Cir.1986) (Italy); *Manetti–Farrow, Inc. v. Gucci*, 858 F.2d 509 (9th Cir.1988) (Italy) (similar facts); *Bonny v. Society of Lloyds*, 784 F.Supp. 1350 (N.D.Ill. 1992) (England); *Riley v. Kingsley Underwriting Agencies*, 969 F.2d 953 (10th Cir.1992) (Eng-

land); and *Paper Express Ltd. v. Pfankuch Maschinen*, 972 F.2d 753 (7th Cir.1992) (Germany).

**13.** The clause in *Bense* read: "the exclusive venue of any suits or causes of action arising directly or indirectly from this Agreement shall be in Dallas County, Texas."

The simple reading of the forum-selection clause is that Germany is the exclusive jurisdiction for all disputes. Caribe has failed to prove this language is in any manner permissive or ambiguous or that it does not cover contractual claims, particularly when plaintiff's main contractual claim is that it was unjustly terminated (and the text of the clause specifies termination). On its face, the clause appears fully applicable and enforceable. *Lambert,* 983 F.2d at 1116 (citing *Docksider, Ltd. v. Sea Technology, Ltd.,* 875 F.2d 762, 764 (9th Cir.1989) ("The prevailing rule is clear . . . that where venue is specified with mandatory language, the clause will be enforced")).

■ Third, Caribe's attempt to challenge the scope of the clause by arguing tort-based theories is completely unconvincing. This is primarily because Caribe has not alleged any tort causes of action and even if it had, these would be inexorably tied to its contractual claims and thus bound to the clause. *See Clinton v. Janger,* 583 F.Supp. 284, 287 (N.D.Ill.1984); *Crescent Corp. v. Procter & Gamble Corp.,* 627 F.Supp. 745, 748 (N.D.Ill. 1986). *See also Ronar, Inc. v. Wallace,* 649 F.Supp. 310, 373–314 (S.D.N.Y.1986); *Weidner Communications, Inc. v. Faisal,* 671 F.Supp. 531, 537 (N.D.Ill.1987). Besides, "the better general rule, we think, is that contract-related tort claims involving the same operative facts as a parallel claim for breach of contract should be heard in the forum selected by the contracting parties." *Lambert,* 983 F.2d at 1121–1122.

■ Lastly, Caribe's implication that the forum-selection clause "ousts" this Court of jurisdiction does not comport to the well-established modern view that such clauses do not deprive courts of jurisdiction, but simply may compel them to decline it. "The argument that such clauses are improper because they tend to 'oust' a court of jurisdiction is hardly more than a vestigial legal fiction." *The Bremen,* 407 U.S. at 12, 92 S.Ct. at 1914; *LFC Lessors, Inc. v. Pacific Sewer Maintenance,* 739 F.2d 4 (1st Cir.1984); Frances M. Dougherty, Annotation, *Validity of Contractual Provision Limiting Place of Court in Which Action May be Brought,* 31 A.L.R. 4th 404, 409 (1992).

Therefore, we hold that the forum-selection clause is valid and that the contract claims are clearly within its scope.

### 3. *Application of Forum–Selection Clause*

■ The facts in this case, under a favorable reading for plaintiff, fail to reveal anything unreasonable about enforcing the forum-selection clause at issue. Quite the contrary, failure to enforce the clause would not only be unfair under the circumstances, but would violate the important public policy that sustains the doctrine itself: Unfettered international transactions, international comity and "sensitivity to the need of the international commercial system for predictability in the resolution of disputes," *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth,* 473 U.S. 614, 629, 105 S.Ct. 3346, 3348, 87 L.Ed.2d 444 (1985), as well as judicial and contractual efficiency. *Carnival Cruise Lines, supra.*

The place of the execution and performance of the contract at issue was Germany. The parties freely negotiated the clause in Germany, and in the German language. Plaintiff's main principals are European citizens and sophisticated businessmen with extensive experience in the German market system as can be logically deduced from the transactions that took place between BMW AG and Caribe (through Messrs. Quintano and Benoit).

The main negotiations for the forum-selection and choice-of-law clauses, took place in Germany. These clauses called for German law and exclusive German venue to resolve any disputes. The venue clause was broad and mandatory. It was made an essential part of each contract renewal and was not altered despite other changes to the contract. Thus, the clause "could hardly have escaped [Caribe's] attention." *The Bremen,* 407 U.S. at 14, n. 16, 92 S.Ct. at 1915, n. 16. The parties exchanged communications in German. The products at issue were manufactured in Germany. They were bought in Germany with German marks. And title to them passed in Germany.

It is difficult to comprehend how Caribe can legitimately claim that it could not fore-

see litigating the termination of its contract with BMW AG—and matters related to that contractual relationship—in Germany given the extensive contacts with that jurisdiction and its agreement to litigate there. Indeed, the conduct of the parties revolved around Germany throughout the nine years of their relationship.

In addition, Caribe has not presented any evidence to show that it could not have its contract claims fully adjudicated in the German courts. Mr. Eberhard Rohm, one of Caribe's attorneys and apparently an expert on German law, submitted an affidavit which speaks only to the treatment German courts give antitrust claims, particularly regarding treble damages. Mr. Rohm's affidavit says nothing about any problem in Germany with Caribe's contractual claims.[14] Also, it would seem that with Mr. Rohm's assistance, plaintiff has little to fear of the German forum in which he voluntarily did business.

Caribe's failure to show that the German forum is unfavorable or that litigating there would be seriously inconvenient compels enforcement of the forum-selection clause. *The Bremen*, 407 U.S. at 18, 92 S.Ct. at 1917 (the party avoiding a choice-of-forum clause must show it would to so "gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court. Absent that, there is no basis for concluding that it would be unfair, unjust or unreasonable to hold that party to its bargain.").

The international quality of the contract and the parties involved here is patent. This is not a local dispute. *The Bremen*, 407 U.S. at 17, 92 S.Ct. at 1917. BMW AG with its far-flung operations is entitled to the uniformity and predictability for which it bargained. *Carnival Cruise Lines, supra* ("A clause establishing *ex ante* the dispute resolution forum has the salutary effect of dispelling confusion as to where suits may be brought and defended, thereby sparing litigants time and expense and conserving judicial resources.").[15] The private international agreement at issue is fundamentally fair and should be given full effect. *The Bremen*, 407 U.S. at 12–13, 92 S.Ct. at 1914–1915; *see also Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519, 94 S.Ct. 2449, 2457, 41 L.Ed.2d 270 (1974).

Finally, we reject plaintiff's reasoning that enforcement of the forum-selection clause regarding its Act 75 claims would violate Puerto Rico public policy.

First, the Puerto Rico Supreme Court itself has established that valid forum-selection clauses fulfill their own significant public policy of not imposing obstacles in interstate and international commerce, as well as "vital interests of the system of justice." *Unisys*, 91 J.T.S. at 8855. *See also Manetti–Farrow*, 858 F.2d at 518 ("we conclude that the federal procedural issues raised by forum-selection clauses significantly outweigh the state interests and the federal rule announced in *The Bremen* controls enforcement of forum clauses in diversity cases."). The *Bremen* Court specifically held that in a *domestic* context choice-of-forum clauses should not be enforced if they "contravene a strong public policy of the forum ... [However,] those considerations [of local public policy] are not controlling in an international commercial agreement." *The Bremen*, 407 U.S. at 15–16, 92 S.Ct. at 1916. The Importer Contract is clearly such an "international commercial agreement."

Second, plaintiff has not shown any evidence, let alone met its burden, that its claims, including its Act 75 claims, cannot be fairly heard in the German forum.

Third, and lastly, judges in this District and our Court of Appeals have dismissed Act 75 claims on grounds of forum-selection clauses, as well as *forum non conveniens*,

14. Also, the fact that Germany has a civilist tradition and jurisdiction similar in many ways to Puerto Rico's code-ruled system, would seem more favorable than not.

15. *The Bremen* Court has said about this issue that one of the compelling factors to enforce forum-selection clauses is that "at the very least [they are] an effort to eliminate all uncertainty as to the nature, location and outlook of the forum in which these companies of differing nationalities might find themselves.... The elimination of all such uncertainties by agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce and contracting." *The Bremen*, 407 U.S. at 13–14, 92 S.Ct. at 1915.

with full knowledge of the local public policy implications. Therefore, it can not be said that such clauses "violate" that "public policy" nor that Act 75 concerns are paramount over other federal common law considerations. *See, e.g., Royal Bed, supra;* and *Royal Bed & Spring Co. v. Famossul Industria E. Comercio De Moveis Ltda.* (Civil No. 87–1054) 89 D.C.O. 164 (August 15, 1989) (Gierbolini, J.).

Caribe has failed to meet its burden. Therefore, finding nothing in the record that would support a refusal to enforce the forum-selection clause, we dismiss plaintiff's contract claims on the grounds of improper venue.

## D. FORUM NON CONVENIENS

■ We echo the Court of Appeals for the Third Circuit in concluding that "[b]ecause we hold that the forum-selection clause should have been enforced, the *forum non conveniens* ruling need not be addressed in detail." *Coastal Steel,* 709 F.2d at 204 (holding in a contract dispute between an American and English corporation that "defendants' motions to dismiss the complaint so as to enforce the forum selection clause ... which stated that disputes would be determined [in England] according to English law should have been granted").

As the preceding discussion demonstrates, there are various reasons requiring dismissal of the present action. The doctrine of *forum non conveniens* also mandates that result.

In presenting this alternative holding that Germany is a more convenient forum than Puerto Rico for this dispute, we have kept well in mind the Supreme Court's admonition in *The Bremen* that the correct approach is to "enforce the forum-selection clause specifically" and that "claims of inconvenience" should not defeat "freely negotiated private international commercial agreements." This is so precisely because any inconvenience—and the corresponding guaranty of predictability of the choice of forum of law—are factored into the benefits and costs of the bargain achieved between sophisticated businessmen experienced in international trade as in the present case. *The Bremen,* 407 U.S. at 15–17, 92 S.Ct. at 1916–1917.

■ Essentially, the *forum non conveniens* doctrine permits discretionary dismissals on a "case-by-case" basis where an alternative forum is available in another nation which is fair to the parties and substantially more convenient for them and the courts. *See Mercier v. Sheraton International, Inc.,* 981 F.2d 1345 (1st Cir.1992). The Court's task is to determine whether the availability of an adequate alternative forum would in fairness be sufficient to overcome a presumption in favor of plaintiff's choice of forum. *Tramp Oil & Marine Ltd. v. M/V Mermaid I,* 743 F.2d 48, 50 (1st Cir.1984). To perform this task, we must consider the private and public interests at stake. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) and *Mercier, supra* (discussing factors).

For many of the same reasons discussed in the prior section, we find that Germany is indeed the more convenient forum for this dispute.

The *availability* of Germany as a forum is unquestioned since BMW AG would clearly be amenable to process there. Likewise, the *adequacy* of the forum is also well-grounded insofar as the remedy that could be provided there is not "so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper Aircraft v. Reyno,* 454 U.S. 235, 254, 102 S.Ct. 252, 265, 70 L.Ed.2d 419 (1981).

After all, "the parties did not enter into a contractual relationship in a foreign jurisdiction in reliance upon our courts. They cannot complain if our courts refuse to meddle in their affairs and remitted them to the place that established and would enforce their rights." *Lockman Foundation v. Evangelical Alliance Mission,* 930 F.2d 764, 678 (9th Cir.1991). It is important to keep in mind that, pursuant to the uncontested facts in this case, Germany was the "place of performance and fulfillment of [the Importer Contract]" as the title of the forum-selection clause itself clearly states.

■ While there is ordinarily a strong presumption in favor of the plaintiff's choice of forum, the presumption is simply inapplicable where, as here, plaintiff brings its law-

suit in a forum different from that chosen in its *international* contract and where the dispute essentially is not a local one involving local interests.

■ This district, as well as the First Circuit, has recognized that the existence of a forum selection contract is relevant to the *forum non conveniens* analysis. In *Royal Bed*, 89 D.C.O. 164, this court (Gierbolini, J.) dismissed on *forum non conveniens* considerations an action brought by a Puerto Rico distributor against the Brazilian manufacturer pursuant to the provisions of Act 75. The agreement between the parties contained a provision which designated the courts of Brazil as competent to settle any disputes derived from the contract, and specified the Brazilian Civil Code as the governing law. *Id.* at 439–440. Among others, the court considered the Act 75 public policy argument and concluded that:

> Here we are dealing with a freely negotiated international commercial transaction between a Brazilian and a Puerto Rican corporation for the distribution of Brazilian products in Puerto Rico. The choice of forum is a contract element which, like all others, is subject to negotiation between the parties. Clearly, whatever inconvenience plaintiff would suffer by being forced to litigate in the contractual forum was foreseeable at the time of contracting. Before we will upset the provisions of the contract, plaintiff must demonstrate that trial in the contractual forum will be so gravely inconvenient so as to deprive it of its day in court.

89 D.C.O. 164 at 441.

The Court of Appeals *affirmed* the dismissal of the action on *forum non conveniens* considerations, in spite of its recognition that Act 75 "refuses to enforce forum-selection clauses providing for out-of-state or foreign venues as a matter of public policy." 906 F.2d at 47. The First Circuit concluded that "the convenience of a Brazil forum, given the parties' expressed preference for that venue, the fairness of transfer in light of the forum-selection clause and the parties' relative bargaining power, as well as their familiarity with the procedure and laws of that forum"

required dismissal in favor of Brazil as the most convenient forum. *Id.*

In sum, the private factors in this case show that Germany is an adequate forum because the access to sources of proof is not difficult given the witnesses and records that are there and the transactions that took place there as well. The availability of compulsory process is unquestioned and the cost of obtaining witness attendance, from the plaintiff's perspective, is negligible given that BMW AG has its operations in Germany. There are no premises that need to be viewed in Puerto Rico and the practical problems inherent in all litigation seem not disproportionate regarding litigation in Germany since most, if not all, the substantial merits discovery will take place outside Puerto Rico, and much of it in Germany. *Mercier, supra.*

The public interest considerations equally weigh in favor of the German forum. There is an unchallenged choice-of-law clause for the application of German law by plaintiff. The calendar congestion of this Court is considerable not only in terms of an excessively demanding and complex criminal and civil caseload, but also because of the well-publicized fiscal crisis facing the federal judiciary which recently has triggered a proposed moratorium on civil jury trials because of the lack of funds to pay jurors. The considerable lack of discovery on the merits also militates toward the foreign jurisdiction. And, finally, as discussed above, there are no local interests violated by a dismissal based on this doctrine given that such dismissals have occurred in this District under very similar circumstances as, for example, in *Royal Bed, supra.* It appears to us that the foreign tribunal can more appropriately conduct this litigation, and should. *Howe v. Goldcorp. Investments ltd.,* 946 F.2d 944 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1172, 117 L.Ed.2d 418 (1992); *Piper Aircraft Co.,* 454 U.S. at 235, 102 S.Ct. at 255.

### IV.  CONCLUSION

For the reasons discussed above defendants' motions are hereby GRANTED as follows:

Counts one and two (antitrust) of the Second Amended Complaint are DISMISSED WITH PREJUDICE for failure to state a cause of action;

Counts three and four (contract) are DISMISSED for improper venue and, in the alternative, on grounds of *forum non conveniens.*

Further, on July 12, 1991, El Fénix de Puerto Rico, Caribe's insurer, tendered an "Intervention Complaint." El Fénix sought leave to intervene claiming a right to any monies Caribe might obtain in the present suit. (Docket No. 12.) On July 10, 1991, the Court granted leave. Since the main action will be dismissed in its entirety, there is no need to discuss the particulars of El Fénix's complaint, and the same is hereby DISMISSED.

Judgment to be entered accordingly.

IT IS SO ORDERED.